UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHEILA M. DARCY,

       Plaintiff,                           Case No. 1:10-cv-848

v.                                             HON. JANET T. NEFF

CITIFINANCIAL, INC. and
CITIMORTGAGE, INC.,

       Defendants.
_____/

**OPINION**

Plaintiff, Sheila Darcy, is a homeowner seeking damages and injunctive relief from her mortgage holder, CitiFinancial, Inc., and its agent, CitiMortgage, Inc. (Defendants). This matter is before this Court on Defendants' Motion for Summary Judgment/Dismissal (Dkt 45). Plaintiff filed a response to Defendants' motion (Dkt 50), and Defendants filed a reply (Dkt 51). Having fully considered the written briefs and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process. *See* W.D. Mich. LCivR 7.2(d). For the reasons that follow, the Court concludes that Defendants' motion is properly denied.

I. BACKGROUND

Plaintiff, who owns and resides at a home at 746 Princeton Ave., Lansing, Michigan, (Dkt 28, Am. Compl., ¶¶ 5, 17, 18), was laid off from her job of approximately ten years in the midst of the 2008 financial downturn (*id.*, ¶ 20). She subsequently sought to prevent foreclosure via modification of her home loan under HAMP, the Home Affordable Modification Program, which

was created pursuant to the October 3, 2008, Emergency Economic Stabilization Act, (EESA), 12 U.S.C. §§ 5201 *et seq*. (2008).  The centerpiece of EESA is the Troubled Asset Relief Program (TARP), through which Congress delegated broad powers to the Secretary of the Department of Treasury to mitigate the financial impact of the foreclosure crisis and preserve homeownership. *Stagikas v. Saxon Mortgage Servs., Inc.*, No. 10–40164–FDS, 2011 WL 2652445, at *1 (D. Mass. July 5,2011) (citing 12 U.S.C. §§ 5201, 5211–5241).  Under TARP, the Secretary is directed to "implement a plan that seeks to maximize assistance for homeowners" and "facilitate loan modifications to prevent avoidable foreclosures."  12 U.S.C. § 5219(a); *see also Stagikas, supra*.

In seeking a mortgage modification under HAMP, Plaintiff submitted financial information and a hardship affidavit to CitiMortgage (Am. Compl., ¶¶ 27, 31, 38).  CitiMortgage responded by offering Plaintiff a HAMP Trial Period Plan (TPP), effective September 1, 2009, which reduced Plaintiff's mortgage payment for the three-month trial period from $595.01 to $324.89 per month (*id.,* ¶¶ 25, 28, 29).  Plaintiff executed the TPP agreement on August 17, 2009 (*id.*, ¶ 31; Defs. Br., Ex. C).

Immediately under the heading, on the first page of the TPP, is the definition of Effective Date, which states: "Trial Period Plan Effective Date (Beginning of Trial Period):  9/1/09" (Defs. Br., Ex. C at 1).  The first full sentence of the TPP agreement states: "If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage" (*id.*).  The second paragraph of the TPP defines Offer as "the offer described in this Plan" and concludes: "I understand that after

I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign It and Lender provides me with a copy of this Plan with the Lender's signature" (*id.*).

Section 2 of the TPP sets forth the amount and due date of each monthly payment and defines the "Trial Period" as "commencing on the Trial Period Effective Date" and ending the earlier of: the first day of the month following the last required payment or on termination of the Plan (*id.* at 2). It states that "TIME IS OF THE ESSENCE under this Plan" and, in § 2(F), identifies three conditions under which the TPP would not result in a permanent modification: "[i]f prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct" (*id*).

Section 3 explains how the permanent loan modification will be calculated. It then provides: "If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date" (*id.* at 3).

Plaintiff alleges that she complied with the TPP requirements, including the required payments, which she continued to make until July 2010, eight months beyond the three-month TPP period, and that her representations in Section 1 continued to be true in all material respects (Am. Compl., ¶¶ 27-41, 52), but that Defendants did not comply with their obligations, in that they did

3

not send her either a signed copy of the Plan, written notice that she did not qualify, or a mortgage modification under the HAMP program (*id.*, ¶¶ 30, 32, 35, 52). Defendants assert that Plaintiff received a notification letter and was informed that there were verification issues regarding her income in December 2009 (Defs. Br. at 2 and Ex. K; Defs. Reply at 8 and Ex. C). The verification issue appears to be related to a tuition grant (Am. Compl., ¶¶ 34-37). Plaintiff alleges that, after she was laid off, she enrolled in Lansing Community College to obtain the training required for a more stable occupation (*id.* ¶ 23). On August 27, 2009, she received a Pell Grant for tuition, which was credited to her credit union savings account (*id.*, ¶ 34), and which she explained to Defendants (*id.*, ¶¶ 37-38). Plaintiff alleges that she received verbal communication that she no longer qualified for HAMP on December 2, 2009, when she attempted to make a monthly payment, and that Defendants accepted her payment and subsequent payments until July 2010 (*id.,* ¶¶ 36, 39-41). Plaintiff received a notice of foreclosure around July 1, 2010 (*id.*, ¶ 56).

Plaintiff filed a complaint in a Michigan circuit court in July 2010, and Defendants removed it to this Court on August 25, 2010, claiming federal question jurisdiction pursuant to 28 U.S.C. § 1331 (Dkt 1). Defendants later filed a Confirmation of Jurisdictional Amount (Dkt 26), which establishes that this Court has diversity jurisdiction under 28 U.S.C. § 1332.

Plaintiff filed an Amended Complaint on January 20, 2011, that claims breach of contract, breach of the duty of good faith and fair dealing, and, in the alternative, promissory estoppel (Dkt 28). On February 7, 2011, she filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction, seeking to enjoin a sheriff's sale scheduled for February 10, 2011 (Dkt 29). This Court granted a temporary restraining order (Dkt 32) and, after further briefing, granted Plaintiff's motion for preliminary injunction on March 1, 2011 (Dkt 39).

Defendants' Motion for Summary Judgment/Dismissal followed (Dkt 45). Defendants maintain that Plaintiff's claims fail as a matter of law under Federal Rule of Civil Procedure 12(b)(6) and 56(a). They argue that Plaintiff has no right of action under HAMP (Defs. Reply at 3-6), that the language of the TPP agreement defeats Plaintiff's breach of contract claim (Defs. Mot., ¶¶ 3, 7), that Defendants were under no covenant of good faith and fair dealing because they were not required "to undertake obligations they did not agree to contractually under HAMP" (*id.*, ¶ 8). Defendants also argue that Plaintiff's promissory estoppel claim fails because it is barred by the statute of frauds and any claimed reliance was unreasonable (*id.*, ¶ 9).

## II.  MOTION STANDARD

When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept all well-pled allegations of the complaint as true and construe them in the light most favorable to Plaintiff. *See Bishop v. Lucent Techs., Inc.,* 520 F.3d 516, 519 (6th Cir. 2008). As the Supreme Court stated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a motion to dismiss will be denied only where the "[f]actual allegations [are] enough to raise a right for relief above the speculative level" on the assumption that all of the complaint's allegations are true. *Id.* at 555. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).

A motion for summary judgment is properly granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In considering a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

5

*Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Because we are exercising diversity jurisdiction in this case, the substantive law of Michigan applies. *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Capital, Inc.*, 274 F.3d 1085, 1092 (6th Cir. 2001). In construing a contract document, this Court "must follow and apply Michigan law in accordance with the controlling decisions of the Supreme Court of Michigan." *Id.* The primary responsibility of a court construing a Michigan contract "is to ascertain and enforce the intent of the parties." *Id. (*citing *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1994); *Sobczak v. Kotwicki*, 79 N.W.2d 471, 475 (Mich. 1956)). The contract must be examined "as a whole, giving effect to all parts and language of a written agreement according to their 'ordinary and natural meaning.'" *Id.* (quoting *City of Wyandotte v. Consol. Rail Corp.*, 262 F.3d 581, 585 (6th Cir. 2001)). If contract terms or clauses appear to conflict, the court must strive to harmonize them. *Id.* (citing *Fresard v. Mich. Millers Mut. Ins. Co.*, 327 N.W.2d 286, 289 (Mich. 1982)). The court must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003). If the provisions of a contract cannot be read "in reasonable harmony, the language of the contract is ambiguous." *Id.* Interpretation of an ambiguous contract is a question of fact for a jury to decide. *Id.* at 453. "[I]f, after the jury has considered all conventional means of contract interpretation and all relevant extrinsic evidence, it is still unable to determine what the parties intended, the jury should then construe the ambiguity against the drafter." *Id.* at 460.

III. ANALYSIS

A. Preemption and Breach of Contract

Defendants seek to dismiss Plaintiff's breach of contract claim on the grounds that (1) there is no private right of action under HAMP, (2) the TPP is not a binding contract for loan modification, and (3) Defendants complied with the TPP in that they sent Plaintiff written notification that a modification would not be offered.

1. Private Right of Action/Preemption

Defendants argue that Plaintiff cannot bring an action because the EESA provides only a limited private right of action for challenges to actions by the Secretary of the Treasury, that HAMP vests compliance enforcement in Freddie Mac, and additional remedies should not be added by the courts (Defs. Reply at 4-6). Plaintiff's Amended Complaint does not, however seek enforcement of the HAMP statutes against Defendants but instead is based on state contract claims concerning the TPP document Plaintiff received from Defendants. Plaintiff's action is not similar, despite Defendants' contention, to the action that resulted in dismissal in *Hart v. Countrywide Home Loans, Inc.*, 735 F. Supp. 2d 741 (E.D. Mich. 2010). In *Hart*, the claim focused on the lender's alleged duties under the HAMP statutes, and the court held that the lending statutes did not impose a duty on the lenders to modify loans. *Id.* at 748. Here, Plaintiff is alleging that the TPP agreement is a contract and that Defendants breached duties contained within the contract itself.

Defendants do not argue that a claim for breach of the TPP contract under state law is expressly preempted by the statutes that established the HAMP program. Rather, without any acknowledgment that preemption is at issue, they suggest an implied preemption, arguing that

Plaintiff's case is inexorably tied to interpretation of the HAMP guidelines (Defs. Reply at 3). This is insufficient grounds for preemption.

The Court of Appeals for the Seventh Circuit considered whether common-law state claims are preempted by the Home Owner's Loan Act, which regulates federal savings associations, preempts state regulation of federal savings associations, and, like HAMP, provides no private right of action for enforcement of the statute. *In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.,* 491 F.3d 638, 642-44 (7th Cir. 2007). Noting that "[i]t would be surprising for a federal regulation" to bar state actions for breach of contract or fraud, the court determined that the "assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies." *Id.* at 643-44.

A recent federal district court decision applied the *In re Ocwen* decision to a TPP agreement and held that a state-law breach of contract claim was not preempted or otherwise generally precluded by HAMP. *Fletcher v. OneWest Bank, FSB*, No. 10 C 4682, 2011 WL 2648606, at * 4 (N.D. Ill. June 30, 2011) (citing *In re Ocwen,* 491 F.3d at 643-44). The *Fletcher* court explained, "without some explicit direction from Congress that it intended programs such as HAMP to have such preemptive force, the Court will not preclude Fletcher from pursuing her basic state common law remedies" *Id.*; *see also Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 351 (D. Mass. 2011) (TPP's relationship to federal statute and regulations does not require dismissal of any state-law claims that arise under TPP). In accordance with the analysis in these cases, we conclude that Plaintiff's contract action is not preempted or otherwise precluded by HAMP.

2. Binding Contract

Defendants also argue that Plaintiff cannot claim breach of contract because the TPP was not a binding contract as a matter of law. They characterize the TPP as step one of a two-step process and claim that it did not result in an executed contract (Defs. Mot., ¶ 7; Defs. Br. at 21). Plaintiff responds by referring to several cases in which a TPP is recognized as a contract (Pl. Br. at 16). In *Bosque*, *supra*, the court noted that the TPP agreement at issue in that case was based on a form of agreement created by the government, cited language like that present in the TPP at issue here, and described it as a document with the appearance of a contract. 762 F. Supp. 2d at 348.

The forms and process here were similar. CitiMortgage offered Plaintiff a TPP as step one in the HAMP program, and then sent the form agreement to Plaintiff for her signature (Am. Compl., ¶¶ 28-31). Plaintiff alleged that she accepted the terms both by making the payments required by the TPP and by signing it and returning two copies to CitiMortgage (*id.*, ¶¶ 31, 33). Defendants argue that the procedure followed with Plaintiff differed from that in the *Bosque* case in that the lender in *Bosque* signed the plaintiffs' TPP's. Other courts, however, have recognized as contracts TPP agreements that were not signed by the lender. *See Belyea v. Litton Loan Servicing, LLP*, Civ. Action No. 10-10931-DJC, 2011 WL 2884964 (D. Mass July 15, 2011). Defendants do not raise the statute of frauds against Plaintiff's contract claim. Moreover, Defendants acknowledge that the TPP was in effect for the three-month period and state in their pleadings that Plaintiff's TPP started in September 2009 ((Dkt 45, Defs. Mot., ¶ 5). This understanding is consistent with the definition of the TPP Effective Date as September 1, 2009 (Defs. Br., Ex. C). We conclude that the TPP is a contract between the parties, subject to the terms and conditions stated in the document that Plaintiff accepted by signing on August 17, 2009.

Many of Defendants' arguments for dismissal of Plaintiff's contract claims are based on the terms of the TPP agreement. Defendants argue that her claim fails under clear and unambiguous terms of the contract and because Defendants complied with the terms of the TPP and terminated it by sending notice to Plaintiff. Plaintiff, in turn, argues that the contract promises a loan modification if she complied with the payments and income verification requirements, that she complied with all the terms of the contract, and that Defendants failed to perform their duties. Some of Plaintiff's arguments for her claims stray to rights and duties under the HAMP statute rather than under the terms of the TPP agreement. Such arguments are not relevant to the viability of her Amended Complaint, which pleads state common-law claims, and will not be given weight in these considerations.

Plaintiff maintains that she complied with the terms of the TPP and that Defendants therefore had a contractual obligation to provide her with a Modification Agreement (Am. Compl., ¶¶ 31-38, 59-67; Pl. Br. at 4-17). Defendants claim that the language of the TPP on which she relies is taken out of context and that clear, unambiguous language in the TPP requires judgment in their favor (Defs. Reply at 6). Defendants point to language in § 2 of the TPP and argue that these terms and others in the TPP (Defs. Br., Ex. C) make it clear that they have no obligation to proceed to Step Two and can let the TPP expire without doing anything. The key sections on which Defendants rely provide in relevant part:

> F. If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement, (ii) I have not made the Trial Period payments required under Section 2 of this Plan, or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the loan documents will not be modified and this Plan will terminate.

> G. I understand that the Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the

conditions required for modification, (ii) I receive a fully executed copy of the Modification Agreement, and (iii) the Modification Effective Date has passed.

Defendant also calls attention to the portion of § 2 that provides that the TPP expires at the end of the three month trial period.

Plaintiff claims that the language of the TPP promised her a modification of her mortgage if she complied with the terms of the TPP. As noted above, the first full sentence of the TPP states:

> If I am in compliance with this Trial Period Plan (the 'Plan') and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage.

Defendants argue that this sentence does not obligate them to provide a Modification Agreement because it is qualified by § 3, which is subject, in turn, to § 2. But § 3 can be read to condition Plaintiff's receipt of a Modification Agreement only on Plaintiff's compliance with the requirements that place duties on her in § 2. The only references to § 2 in § 3 are a mention of payment procedures in § 2D and a statement of Plaintiff's duties that provides:

> If I comply with the requirements in Section 2 and my representations in Section 1 continue to be true in all material respects, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any late charges accrued to date.

It is clear in the TPP that "I" refers only to Plaintiff and not to Defendants, the "Lender." The requirements of § 2 that impose a duty on Plaintiff are those requiring timely payment of the TPP payment amounts.

While both parties try to isolate the terms that support their interpretation, when read as a whole, the TPP document is far from clear. The parties' attempts to support their positions with references to portions of the agreement highlight the fact that some of the terms conflict with others.

11

While this Court is mindful that it should strive to harmonize the terms of the TPP, *Wonderland*, 274 F.3d at 1092, the Court must "give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp*, 663 N.W.2d at 453. The terms of the TPP cannot be read "in reasonable harmony" and its language is, thus, ambiguous. *See id.*[1] Plaintiff's breach of contract claim hinges on ambiguities in the contract and precludes dismissal as a matter of law.

### 3. Written Notification

The parties also contest whether summary judgment should be entered on Plaintiff's breach of contract claim based on Defendants' evidence that they sent written notice to Plaintiff that she did not qualify for a mortgage modification, as referenced in § 1 of the TPP. Plaintiff claims that she fulfilled all of the requirements for a loan modification, and that, although she was informed by telephone in December 2009 that she no longer qualified for a HAMP modification, she never received written notice (Am. Compl., ¶¶ 36-39). Defendants do not provide any evidence to counter Plaintiff's claim that she was in compliance with the TPP in that her financial representations were true and she made the required payments.

Defendants do, however, assert in their motion that they sent written notice that her request

---

[1] Cases that have dismissed a breach of contract claim under a TPP agreement generally have not discussed the language of § 3 of the TPP, quoted above, or addressed whether conflicting language in the TPP created ambiguity. *Brown v. Bank of New York Mellon*, No. 1:10-cv-550, 2011 WL 206124, at *3 (W.D. Mich. Jan.21, 2011), for example, cites only §§ 2F and 2G of the TPP, which provide that loan documents will not be modified if lender does not send the borrower a Modification Agreement. A recent case, *Thomas v JPMorgan Chase & Co.*, No. 10 Civ. 8993(SAS), 2011 WL 3273477, at * 8 (S.D.N.Y. July 29, 2011), cites language similar to § 3 in the TPP preamble and acknowledges that it is "misleading." *Thomas* does not cite § 3 of the TPP agreement, however, and, on the basis of language in § 2, without any further discussion of conflicting terms, holds that the TPP is not a binding contract for mortgage modification. *Id.* Additionally, such cases are distinguishable based on the facts or the specific claims asserted.

for a modification was denied, and they support this claim with a file copy of a 12/10/09 notice letter (Dkt 45, Defs. Mot., ¶¶ 5-6 and Ex. K). Defendants have also submitted an affidavit attesting that the file copy was a true and accurate copy of the correspondence sent, except that the copy sent would have been on letterhead (Dkt 51, Defs. Reply, Ex. C). Plaintiff's only evidence of nonreceipt is her affidavit, attesting that she did not see or receive the 12/10/09 letter (Am. Compl., Ex. A, ¶¶ 32-33). Defendants' evidence may well be sufficient to establish that Defendants provided the written notice referenced in § 1 of the TPP. In light of the ambiguities in the TPP as to the promises and responsibilities of the parties, however, this evidence is insufficient to support summary judgment for Defendants because it does not resolve all of the issues raised by Plaintiff's claim of breach of contract.

B. Breach of Duty of Good Faith and Fair Dealing

While Michigan does not recognize an independent tort claim for breach of the implied covenant of good faith and fair dealing, every contract in which performance is left to a party's discretion is subject to an implied covenant of good faith. *McLiechey v. Bristol West Ins. Co.*, 408 F. Supp. 2d 516, 522 (W.D. Mich. 2006); *Lowe's Home Centers, Inc. v. LL & 127, LLC*, 147 Fed App'x 516, 523 (6th Cir. 2005). "[W]here the manner of performance under a contract is left to the discretion of a party, that party may breach the contract by exercising its discretion in bad faith." *Lowe's*, 147 Fed. App'x at 523-24.

Plaintiff alleges that Defendants breached their duty of good faith and fair dealing by inaction, lack of timely verification that she qualified under the TPP, and failure to timely provide her with a Modification Agreement (Am. Compl., ¶¶ 69-74). Defendants provide no evidence to support a claim that they acted in good faith or made any effort at all to verify the information

13

Plaintiff submitted during the three-month TPP period. Defendants simply say that verification of her income "became problematical" in December 2009 (Defs. Br. at 18), which was after the three-month TPP period, and that they fulfilled any duty by sending written notice that Plaintiff was not qualified for modification.

Plaintiff's claim of breach of the duty of good faith and fair dealing is dependent on the existence of contract duties, which is, in turn, dependent on resolution of ambiguities in the TPP contract. Defendants' motion is thus denied, and this claim is permitted to proceed in conjunction with Plaintiff's breach of contract claim.

### C. Promissory Estoppel

Defendants contend that Plaintiff cannot prevail on her third count, a promissory estoppel claim, pled in the alternative, because her claim of reliance is based on isolated language in the TPP and her claim of a promise is barred by the statute of frauds (Defs. Mot., ¶ 9). Defendants cite Michigan's statute of frauds, which provides that an action cannot be brought against certain financial institutions unless the contract or promise is in writing and signed. MICH. COMP. LAWS ANN. § 566.132(2)(b) and (3). Plaintiff counters that her claim is not subject to dismissal under the statute of frauds because it is based on a writing, the TPP, and that Defendants' signature was waived and Defendants are estopped by her performance of the terms (Pl. Br. at 20-21). Defendants, in reply, characterize Plaintiff's argument as "absurd" but do not cite any support for their contention that Plaintiff's allegations are insufficient under Michigan law to avoid dismissal under the statute of frauds (Defs. Reply at 9). The issue of Plaintiff's reliance is subject to analysis of the ambiguous TPP provision and is not ripe for dismissal. For these reasons, Defendants' motion is denied on the promissory estoppel claim.

14

## IV.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment/Dismissal (Dkt 45) is DENIED.  An Order will be entered consistent with this Opinion.


DATED: August 25, 2011            /s/ Janet T. Neff
                                  JANET T. NEFF
                                  United States District Judge